# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION

## CASE NO. 18-25142-CIV-GOODMAN
## [CONSENT CASE]

DEUTSCHE BANK SECURITIES, INC.,

    Plaintiff,

v.

MANUEL SABA ADES, et al.,

    Defendants.

_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

Plaintiff Deutsche Bank Securities, Inc. ("DBSI") filed a complaint for declaratory judgment and injunctive relief against Defendants Manuel Saba Ades and Alberto Saba Ades (the "Saba brothers"), seeking to preclude them from proceeding with an arbitration they have filed against DBSI before the Financial Industry Regulatory Authority ("FINRA"). [ECF No. 1]. DBSI contends that FINRA is an improper forum for the Saba brothers to pursue their claims, which include compensatory damages of more than $7.7 million. [ECF No. 1].

The day after it filed its complaint, DBSI filed a motion for a preliminary and permanent injunction, seeking the same injunctive relief. [ECF No. 5]. The Saba brothers filed a motion to dismiss and to compel arbitration. [ECF No. 12]. The Saba brothers

also filed an opposition response to the motion for injunctive relief. [ECF No. 13]. DBSI then filed a memorandum that doubled as a reply in support of its motion and a response in opposition to the Saba brothers' motion. [ECF No. 21]. The Saba brothers then filed a reply in support of their motion to dismiss/motion to compel arbitration. [ECF No. 23].

At a January 29, 2019 status conference hearing, counsel for all parties advised the Court that an evidentiary hearing was not necessary on DBSI's motion for injunctive relief, that the Court could rule on the parties' briefing, and that it was therefore not necessary to issue a trial scheduling order. [ECF No. 22]. The Court appreciates counsel's candid disclosures and also acknowledges the high caliber of the briefing and the professionalism of counsel.

As outlined below, the Court denies DBSI's motion for a preliminary injunction because (1) DBSI has failed to demonstrate that it has a substantial likelihood of success on the merits of its claim that the parties' dispute is not arbitrable before FINRA, (2) DBSI has not adequately demonstrated irreparable harm absent injunctive relief, (3) DBSI has failed to show the balance of equities weighs in its favor, and (4) public policy does not support enjoining arbitration in this instance.

I. **Factual Background**

The Saba brothers filed a statement of claim before FINRA against DBSI, a FINRA member. [ECF No. 1-1]. The statement of claim alleges that DBSI sold (and

recommended to) the Saba brothers its product: the "5 year Deutsche bank USD Quintus Series D 100% Principal Protected Note" (the "Quintus Note"). The Saba brothers claim that Jose Luis Llamas contacted them in 2013 about investing in the Quintus Note and set up a meeting at DBSI's office in New York City to discuss the Quintus Note. [ECF No. 1-1, p. 4].

Llamas was alleged to be the Saba brothers' "trusted, long-term advisor registered with and employed by DBSI." [ECF No. 1-1, p. 4]. According to DBSI, Llamas was employed by its subsidiary Deutsche Bank Trust Company Americas ("DBTCA") but acted as a "relationship manager" and "was responsible for maintaining and managing banking relationships" and "introducing client specialists to prospective new clients." [ECF No. 1-3, p. 3]. DBSI also states that Llamas was a registered person with DBSI. [ECF No. 5, p. 8].

Llamas states in his declaration that he acted as a "dual-hatted" employee for both DBTCA and DBSI and offered his customers securities at many different Deutsche Bank entities. [ECF No. 12-3, pp. 2-3]. Llamas further states that his compensation was determined by revenue generated by customer accounts at all booking centers (DBSI, DBTCA, etc.). [ECF No. 12-3, p. 3].[1]

---

[1] The Saba brothers opened accounts at different Deutsche Bank entities. According to DBSI, two accounts were opened and maintained at Deutsche Bank (Suisse) and another account was opened at DBSI in 2008. In opening the DBSI account, which is unrelated to the Quintus Note, the Saba brothers entered into a broad arbitration agreement with DBSI. [ECF No. 1-3, p. 3].

According to the Saba brothers, Llamas and other persons affiliated with DBSI represented to them that the Quintus Note was a conservative investment product and that the asset managers would ensure a favorable performance. [ECF No. 1-1, pp. 1, 6]. The Saba brothers were to receive a loan through one of DBSI's affiliates and would invest $7.7 million in cash of the total face value of the Quintus Note, and the remainder would be financed through a non-recourse loan from DBSI's affiliate. [ECF No. 1-1, p. 4].[2]

The Quintus Note did not turn out to be a conservative investment product, however, and the Saba brothers allege that they lost their entire $7.7 million equity investment. [ECF No. 1-1, p. 7]. The Saba brothers believe that DBSI steered them to the Quintus Note, as opposed to a less-risky investment, because DBSI and its affiliates would make millions in asset-management fees and other compensation from the assets that comprised the Quintus Note. [ECF No. 1-1, p. 8].

In their statement of claim, the Saba brothers allege that DBSI breached its duties to fully disclose all risks associated with the Quintus Note and to make suitable investment recommendations. [ECF No. 1-1, p. 9]. The Saba brothers allege the following counts against DBSI: negligence, breach of fiduciary duty, and constructive

---

[2] According to DBSI, the Quintus Note was issued by Deutsche Bank AG, Frankfurt and purchased through Deutsche Bank (Suisse) SA. [ECF No. 5, p. 2]. Further, the Saba brothers' investment of $7.7 million was funded by a loan from DB Private Clients Corp., a subsidiary of DBTCA, and the Saba brothers obtained a credit facility from DB Suisse for $92.3 million for the Quintus Note. *Id.* The Saba brothers do not appear to dispute these allegations.

fraud; failure to supervise its agents, common law fraud, and fraudulent misrepresentations; and unjust enrichment. [ECF No. 1-1, pp. 9-10]. Specifically, the Saba brothers claim that DBSI (1) had a duty to supervise its agents, including Llamas; (2) should have known that its brokers and other agents misrepresented material information when recommending the Quintus Note; and (3) failed to take any action to stop or reverse the brokers and other agents' misconduct. [ECF No. 1-1, pp. 9-10]. The Saba brothers seek compensatory damages of at least $7.7 million. [ECF No. 1-1, p. 11].

DBSI then filed this action seeking a declaration that the Saba brothers' claim is not arbitrable before FINRA and seeking injunctive relief enjoining the arbitration. [ECF No. 1]. DBSI also filed a motion for preliminary and permanent injunction to enjoin the Saba brothers from arbitrating their claim against DBSI before FINRA. [ECF No. 5].

## II. Standard for Preliminary Injunction

To obtain a preliminary injunction, the movant must establish four elements: (1) substantial likelihood of success on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). Generally, the most important determination is whether there is a substantial likelihood of success on the merits. *See Schiavo ex rel. Schindler v. Schiavo*, 357 F. Supp. 2d 1378, 1383 (M.D. Fla. 2005) ("The first of the four prerequisites

to temporary injunctive relief is generally the most important.").

**III. Analysis**

   **a. Substantial Likelihood of Success on the Merits**

As explained below, DBSI has not shown that there is a substantial likelihood of success regarding its claim that the dispute with the Saba brothers is not arbitrable before FINRA. Specifically, DBSI may prevail on its argument that the parties' dispute does not meet FINRA Rule 12200, which requires arbitration between customers and members of FINRA. To be sure, DBSI *might* prevail on that theory, but it has not established here that it is *likely* to do so.

      **i. Arbitration Under FINRA**

FINRA is a "self-regulatory organization established under the Securities Exchange Act of 1934." *Pictet Overseas Inc. v. Helvetia Trust*, 905 F.3d 1183, 1187 (11th Cir. 2018). As a FINRA member, DBSI agrees to comply with FINRA's rules. *See id.* One such rule is FINRA Rule 12200, which "requires a FINRA member and its associated persons to arbitrate certain disputes with customers before FINRA upon the customer's demand." *Id.* Rule 12200 provides:

> Parties must arbitrate a dispute under the Code if:
> - Arbitration under the Code is either:
>   (1) Required by written agreement, or
>   (2) Requested by the customer;
> - The dispute is between a customer and a member or associated person of a member; and
> - The dispute arises in connection with the business activities of the member or the associated person . . . .

FINRA Rule 12200.

Two findings must be made under FINRA Rule 12200 to compel arbitration against a FINRA member. The first is that the claimant is a "customer" of the FINRA member. *See* FINRA Rule 12200. This term has been broadly interpreted to encompass customers of an associated person of a member even if there was no direct customer relationship between the FINRA member and the customer. *See, e.g.*, *Multi-Financial Securities Corp. v. King*, 386 F.3d 1364, 1368-69 (11th Cir. 2004) (collecting cases finding that "customer" of member includes customers of an associated person of a member).

The second finding necessary to compel arbitration under FINRA -- that "the dispute arises in connection with the business activities of the member or the associated person" -- requires that there be "some connection" between the customer and the FINRA member. *Id.* at 1370 (stating that the FINRA Code's second requirement "provides for the general connection between the customer's dispute and the member's conduct"); *see also Pictet Overseas Inc.*, 905 F.3d at 1189 (stating that Rule 12200 requires that there be "some connection" between the dispute and the associated person's relationship with the FINRA member).

The Eleventh Circuit has made clear that a customer's claim that a FINRA member failed to supervise its associated person in connection with the dispute satisfies the second requirement of a connection between the customer and the member's conduct. *See, e.g.*, *MONY Securities Corp. v. Bornstein*, 390 F.3d 1340, 1344-45 (11th Cir.

2004) ("[T]he Eleventh Circuit and most other courts hold that supervision of associated persons arises in connection with the member's business."); *King*, 386 F.3d at 1370 (collecting cases and finding that "King's claim of negligent supervision satisfies the Code's second arbitration condition").

For example, in *King*, King invested money in a trust agreement on the advice of Micciche, who was a registered representative of IFG. *King*, 386 F.3d at 1365. The investment was with another unrelated company, Evergreen, that went bankrupt, and King lost her entire investment. *Id.* King initiated arbitration against IFG and argued that IFG negligently supervised Micciche, resulting in the bad investment with Evergreen. *Id.* at 1366, 1370. King claimed that she relied, in part, on Micciche's affiliation with IFG in making the investment and that Micciche provided her with a business card stating that he was affiliated with IFG. *Id.* at 1365-66.

IFG filed a declaratory judgment action seeking a declaration that the dispute was *not* arbitrable and seeking to enjoin the then-pending arbitration. *Id.* at 1366. The district court compelled arbitration, finding that the requirements for arbitration under the NASD (the predecessor to FINRA)[3] were met and IFG appealed. *Id.* On appeal, the

---

[3] "Prior to 2007, FINRA was known by its prior name, the National Association of Securities Dealers, Inc. ('NASD')." *Grant v. Rotolante*, 147 So. 3d 128, 135 n.4 (4th DCA 2014). The requirements for arbitration under the NASD are materially the same as under FINRA Rule 12200 and require that an investor show that his or her claim: "[1] involves a dispute between a member and a customer or an associated person of the member and a customer; and [2] arises in connection with the business activities of the

8

Eleventh Circuit found that King was a "customer" of IFG because it was undisputed that King dealt with Micciche, who was an associated person of IFG. *Id.* at 1370.

As to the second prong, whether the dispute arose in connection with the member's business, the Court stated:

> King's cause of action, for example, arises from the actions of Micciche in giving advice regarding investments at a time when he was a person associated with IFG, a brokerage firm in the business of providing investment advice through its representatives. King's primary claim, specifically, is that IFG negligently supervised Micciche, resulting in the troubled Evergreen investment. The NASD requires that its members supervise the activities of their associated persons, as part of their business. We conclude that King's claim of negligent supervision satisfies the Code's second arbitration condition.

*Id.* at 1370.

Similarly, in *MONY Securities Corp. v. Bornstein*, Keller, a financial planner, came to the Bornsteins' home and described several investment opportunities. 390 F.3d at 1341. Keller had affiliations with several businesses, including with MONY. *Id.* The Bornsteins invested in five viatical settlement contracts through a company unrelated to MONY, and that company later failed. *Id.* The Bornsteins filed an arbitration claim with the NASD against MONY. *Id.* MONY sought declaratory and injunctive relief to enjoin the arbitration. *Id.* at 1342. The district court granted summary judgment in favor of the Bornsteins. *Id.*

---

member or in connection with the activities of the associated person." *King*, 386 F.3d at 1370.

On appeal, the Eleventh Circuit found that the Bornsteins were customers of MONY because "it is undisputed that they are customers of Keller, and that Keller was an associated person with MONY." *Id.* at 1344. As to the second prong, MONY argued that the dispute did not arise in connection with its business because the Bornsteins invested in contracts with an unrelated company. *Id.* The Court found that, like in *King*, "supervision of associated persons arises in connection with the member's business," and thus the NASD Code required arbitration of the dispute. *Id.* at 1344-45.

### ii. DBSI has not established a likelihood that it will prevail on its claim that Rule 12200 is not met here.

Here, the Court is faced with a similar scenario to those presented in *King* and *MONY*. It is undisputed that (1) the Saba brothers were customers of Llamas; (2) Llamas was an associated person (registered person) of DBSI at the time the Saba brothers entered into the Quintus Note; and (3) the Saba brothers allege in their statement of claim before FINRA that DBSI negligently supervised Llamas, and other associated persons of DBSI, in connection with the Quintus Note. [ECF Nos. 1-1, pp. 9-10; 5, p. 8].

The Court need not look beyond those alleged facts to determine that DBSI has not demonstrated a substantial likelihood of success on the merits of its claim that the parties' dispute is not arbitrable before FINRA. *See MONY*, 390 F.3d at 1341 (noting there were several disputed facts between the parties, but "the facts that matter in this case are undisputed: the Bornsteins were customers of Keller, who was an associated person of MONY. This undisputed fact pattern is somewhat common, and the

10

overwhelming response is that the case is subject to arbitration."). Just like in *MONY* and *King*, the fact that the Quintus Note was held by different entities (other Deutsche Bank entities) does not preclude the Saba brothers' claim of arbitration under FINRA. *See MONY*, 390 F.3d at 1344; *King*, 386 F.3d at 1370.

The Court does not find compelling DBSI's argument that *Pictet Overseas Inc. v. Helvetia Trust*, 905 F.3d 1183, 1183 (11th Cir. 2018) supports a contrary finding. [ECF No. 5, p. 12]. In *Pictet Overseas*, Helvetia Trust hired Callahan, an asset manager, to invest its funds. *Pictet Overseas*, 905 F.3d at 1185. Callahan opened accounts with Banque Pictet. *Id.* After Helvetica Trust wired money into accounts at Banque Pictet, Callahan stole Helvetica Trust's money. *Id.* Helvetia Trust then filed a claim for arbitration against the eight individuals who owned Banque Pictet (the "Partners") and against Banque Pictet's affiliates, including Pictet Overseas. *Id.* Pictet Overseas then filed an action to enjoin the arbitration. *Id.*

The district court found that the claims were not arbitrable because Helvetica Trust was not a customer of Pictet Overseas or the Partners, the Partners were not associated persons of Pictet Overseas, and the dispute did not arise in connection with the business activities of Pictet Overseas or the Partners. *Id.* at 1186-87.

On appeal, the Eleventh Circuit noted that Helvetica Trust relied "on a chain of assertions" to support its claim that Rule 12200 was met, which it could not meet. *Id.* at 1188. The Court stated that FINRA Rule 12200 requires that "the dispute has *some*

11

*connection* to the associated person's relationship with the FINRA member." *Id.* at 1189 (emphasis added). The Court found that Helvetica Trust's claims arose out of the Partners' business activities undertaken as general partners of Banque Pictet, which had "*no connection* to the business activities of Pictet Overseas or of the Partners undertaken in their capacity as associated persons of Pictet Overseas." *Id.* at 1190.

Here, the Saba brothers allege in their statement of claim that DBSI failed to supervise Llamas (an associated person of DBSI) and other associated persons of DBSI who were acting on behalf of DBSI during the marketing and sale of the Quintus Note to the Saba brothers. [ECF No. 1-1, pp. 3-7]. In support, the Saba brothers provide an email from Llamas regarding the Quintus Note, which stated, under his signature block, "Securities offered through Deutsche Bank Securities, Inc." [ECF No. 13-6]. This is unlike the situation in *Pictet Overseas*, where the only connection that could be drawn between the investor and the FINRA member was that the investor held its money with a company that shared the same partners with the FINRA member, Pictet Overseas. *See Pictet Overseas*, 905 F.3d at 1185, 1188.

The Court's finding in *Pictet Overseas* that there must be "some connection" between the dispute and the associated person's relationship with the FINRA member is not inconsistent with *King* and *MONY*, which found that the FINRA member's alleged failure to supervise the associated person, allowing for the bad investment, provides the requisite "connection between the customer's dispute and the member's

conduct." *King*, 386 F.3d at 1370; *see also MONY*, 390 F.3d at 1345 ("[S]upervision of associated persons arises in connection with the member's business."). DBSI fails to adequately address this, and it fails to address at all the effect of the Saba brothers' allegation in their statement of claim that DBSI negligently supervised Llamas. [*See* ECF No. 21].

Further, because the Court finds that DBSI has not established a substantial likelihood of success on the merits as to DBSI's argument under the FINRA Rule 12200 factors, and Rule 12200 serves as a sufficient agreement to arbitrate on its own, *MONY*, 390 F.3d at 1342, the Court need not consider whether the broad arbitration provision in the 2008 Account Agreement entered into between the Saba brothers and DBSI requires arbitration of the subject dispute. [ECF No. 12-1, p. 5].

**b. DBSI does not meet the remaining factors necessary for an injunction.**

The Court also finds that DBSI fails to meet the remaining factors necessary for an injunction -- irreparable harm, that the balance of equities tips in its favor, and that injunctive relief is not against the public interest.

DBSI's one-paragraph argument that it will suffer irreparable harm by arbitrating a claim it does not believe should be arbitrated is not compelling. [ECF No. 5, p. 16]. DBSI does not allege that it will suffer any harm other than the expense of arbitration. *Id.* This does not constitute *irreparable* harm. *See Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990)

13

("An injury is 'irreparable' only if it cannot be undone through monetary remedies."); *see also Kalb v. Quixtar, Inc.*, No. 307-CV-1061-J-33TEM, 2008 WL 879406, at *7 (M.D. Fla. Mar. 28, 2008) (citation omitted) ("The financial burden of arbitration does not constitute irreparable injury.").

Next, the Court considers whether the threatened injury to DBSI outweighs whatever damage the proposed injunction may cause the Saba brothers. As explained above, DBSI has not shown that it is likely to succeed on the merits of its claim and it has not articulated a threat of *irreparable* harm. The Saba brothers have an interest in pursuing arbitration, a "highly favored mechanism for dispute resolution." *UBS Fin. Servs. Inc. v. Carilion Clinic*, 880 F. Supp. 2d 724, 734 (E.D. Va. 2012), *aff'd*, 706 F.3d 319 (4th Cir. 2013). Accordingly, DBSI has failed to show the balance of the equities tips in its favor.

Finally, the question of whether the public interest would be harmed if the parties' FINRA arbitration is not enjoined turns on whether DBSI is likely to succeed on the merits of its claim. Here, the Court finds that DBSI has not adequately demonstrated a likelihood of success on the merits of its claim. Thus, public policy does not disfavor arbitration in this instance. *See, e.g.*, *Kalb*, 2008 WL 879406, at *8 (finding that, where there was an agreement to arbitrate, public interest favored arbitration); *UBS Fin. Servs. Inc.*, 880 F. Supp. 2d at 734 (finding that where movant was unlikely to succeed on the merits of its claim that arbitration was not required under FINRA Rule 12200, public

policy favored allowing the arbitration to proceed).

## IV. Conclusion

Accordingly, the Court denies DBSI's motion for a preliminary injunction because (1) DBSI has failed to demonstrate that it has a substantial likelihood of success on the merits of its claim that the parties' dispute is not arbitrable before FINRA, (2) DBSI has not established irreparable harm absent injunctive relief, (3) DBSI has failed to show the balance of equities weighs in its favor, and (4) public policy does not support enjoining arbitration here.

**DONE AND ORDERED** in Chambers, Miami, Florida, on March 7, 2019.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All counsel of record